FILED

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

2015 NOV -6 P 2: 37

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| LANTZ DAY, ) | COMPLAINT |
| ) | |
| Plaintiff, ) | JURY TRIAL DEMAND |
| ) | |
| v. ) | CIVIL ACTION NO. 1:15-CV-1477 |
| ) | (TSE/MSN) |
| CITY OF FREDERICKSBURG, ) | |
| VIRGINIA; OFFICER JOSEPH YOUNG, ) | |
| in his official and individual capacities; ) | |
| FORMER CHIEF JAMES POWERS, in his ) | |
| individual capacity; JOHN DOEs 1-5; ) | |
| ) | |
| Defendants. ) | |
| ) | |

## COMPLAINT

Plaintiff Lantz Day ("Mr. Day"), by counsel, and for his Complaint against the City of Fredericksburg, Virginia; Officer Joseph Young; former Chief James Powers; and John Does 1 through 5 (collectively, "Defendants") alleges as follows:

## NATURE OF ACTION

1.     This is an action for damages and declaratory relief stemming from the unlawful use of a taser against Mr. Day under 42 U.S.C. § 1983 ("§1983"). Mr. Day seeks relief due to Defendants' use of excessive force against Plaintiff in violation of the Fourth and Fourteenth Amendments to the United States Constitution, the failure of Defendant Powers to train and supervise Defendant Joseph Young, and violations of Virginia common law.

2.     Plaintiff seeks reasonable attorneys' fees under 42 U.S.C. § 1988 ("§1988") and other applicable laws.

## PARTIES

3.     Mr. Day, an African-American male, is a citizen of the Commonwealth of Virginia and a resident of Orange County.

4.     The City of Fredericksburg ("the City") is the governing body of the City of Fredericksburg, a political subdivision of Commonwealth of Virginia, made amenable to suit by its charter and city code.

5.     The City is responsible for, among other things, the adoption and administration of policies and procedures regarding law enforcement in the City, taser training and supervision, officer misconduct supervision, adequate internal investigation and training for the manner in which officers are to use nonlethal force, and officer retention and termination policies.

6.     Defendant Officer Joseph Young ("Young") is and at all times material to this Complaint was working for the City of Fredericksburg, Virginia as a Police Officer and was a "person" subject to suit under §1983. At all times relevant herein, Young was in uniform and displaying his badge of authority. Plaintiff brings this suit against Young in both Young's individual and official capacities.

7.     Defendant Former Chief James Powers ("Powers") was at all times material to this Complaint the Chief of Police for the City of Fredericksburg, Virginia, and he was responsible for establishing department policy, and the hiring, firing, retention, and supervision of his officers. Plaintiff brings this suit against Powers in Powers' individual capacity.

8.     Defendants identified as John Does 1 through 5 are individuals in addition to Young responsible for ensuring Mr. Day received medical evaluation and care pursuant to the version of FPD Directive 302.00 that was in force at the time of the incident which stated that "[a]ll subjects who have been Tased **_shall_** receive a medical evaluation." (emphasis in original).

2

9.      The Fredericksburg Police Department ("FPD") is an agency created by and existing under the aegis of the City, and subject to control and/or mandate by City.

10.     The FPD is and was an agency of the City having the purpose of "provid[ing] for the protection of its inhabitants and property and for the preservation of peace and good order therein." Va. Code § 15.2-1700.

11.     Plaintiff has retained the services of the undersigned attorneys and has become obligated to pay reasonable attorneys' fees for such services rendered in pursuit of the claims asserted herein.


## JURISDICTION AND VENUE

12.     This Court has federal question jurisdiction over the subject matter of this complaint pursuant to 28 U.S.C. § 1331, because this action asserts a deprivation of one or more federal constitutional rights under color of law and under 42 U.S.C. § 1981 and 1983, to provide remedial relief of damages.

13.     This Court has supplemental jurisdiction over Mr. Day's state law claims against Defendant under 28 U.S.C. § 1367(a) because the facts of the federal claims occurred in this judicial district and form part of the same case or controversy.

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the events described in this action took place within this judicial district.


## FACTS

15.     On November 9, 2013, Mr. Day was involved in a multi-car accident with five other vehicles. As a result, Mr. Day was confused and dazed.

16.     A private citizen with law enforcement experience, Robert Schmidt, found Mr. Day in between the driver- and passenger-side seats in the vehicle in which he had been riding.

17.     Mr. Day exited the vehicle through the passenger-side door and began slowly walking away from the vehicle.

18.     After walking away from the crash, Mr. Day walked back to the crash; he subsequently wandered away and back again.

19.     Defendant Young, a City of Fredericksburg police officer, arrived on the scene after being called due to the accident.

20.     Young ordered Mr. Day to lie on the ground.

21.     Young specifically told Mr. Day he was not under arrest.

22.     Mr. Day failed to comply at first, for which Young drew his two-probe, single-cartridge model taser and pointed it at Mr. Day in order to ensure compliance.

23.     Mr. Day then lay on the ground in the prone position.

24.     While Young was giving Mr. Day instructions, Mr. Day stood up and started running away from Young.

25.     In response, Young deployed his taser on Mr. Day.

26.     As described by the FPD in the incident report released publicly on November 12, 2013 and attached hereto as Exhibit A, "[t]he subject refused to comply with the officer's commands and briefly attempted to flee until the officer deployed a Taser and took the subject into custody." Ex. A.

27.     Mr. Day fell down after taking a small number of steps away from Young.

28.     It is unclear whether Mr. Day's fall was the result of the taser deployment or Mr. Day tripping.

4

29.     The barbs of Young's taser hit Mr. Day in his back and right sleeve and discharged an electrical current of fifty thousand volts into Mr. Day's body.

30.     Young maintained the electrical current from the taser into Mr. Day's body for forty-two seconds.

31.     While Young tased Mr. Day, Mr. Day screamed in pain and pleaded for Young to stop.

32.     While Young tased Mr. Day, Mr. Day flailed his legs.

33.     After Young tased Mr. Day, Young handcuffed Mr. Day and placed him under arrest.

34.     At no point did Mr. Day exhibit violent or aggressive behavior.

35.     At no point did Mr. Day threaten or intimidate Young.

36.     At no point did Mr. Day present a danger to Young.

37.     At no point did Mr. Day make any furtive movements that suggested he was in possession of or drawing a weapon.

38.     Young could see Mr. Day's hands as he stood up and that Mr. Day was not an immediate threat; still, Young tased Mr. Day.

39.     Young tased Mr. Day for far longer than was required to incapacitate Mr. Day.

40.     Mr. Day was immediately incapacitated within the first five seconds that the taser was deployed.

41.     The sixth through tenth seconds of taser deployment were not necessary to subdue or incapacitate Mr. Day.

42.     The eleventh through fifteenth seconds of taser deployment were not necessary to subdue or incapacitate Mr. Day.

43.     The sixteenth through twentieth seconds of taser deployment were not necessary to subdue or incapacitate Mr. Day.

44.     The twenty-first through twenty-fifth seconds of taser deployment were not necessary to subdue or incapacitate Mr. Day.

45.     The twenty-sixth through thirtieth seconds of taser deployment were not necessary to subdue or incapacitate Mr. Day.

46.     The thirty-first through thirty-fifth seconds of taser deployment were not necessary to subdue or incapacitate Mr. Day.

47.     The thirty-sixth through fortieth seconds of taser deployment were not necessary to subdue or incapacitate Mr. Day.

48.     The forty-first and forty-second seconds of taser deployment were not necessary to subdue or incapacitate Mr. Day.

49.     At no point during the forty-two second deployment did Young turn off the taser's electrical current in order to assess the situation.

50.     Mr. Day ran away from Young, wanting to get away from the police.

51.     Mr. Day did not pose any threat to Young, as evidenced by the fact that Young fired his taser into Mr. Day's back.

52.     Mr. Day did not receive a medical evaluation subsequent to being tased.

53.     Mr. Day did not receive any medical treatment subsequent to being tased.

54.     Defendants confined Mr. Day for two days after being tased, but did not provide him a medical evaluation or treatment at any point during those two days.

55.     After his release on bond, Mr. Day sought treatment at a hospital. He was found to have suffered a concussion and a back injury.

6

56.     The version of FPD Directive 302.07, governing the use of force and, specifically, the use of tasers, in effect on the date in question, having last been revised on October 26, 2012, stated as follows:

> The Taser is to control dangerous or violent persons especially when a reason exists to believe that it would be unsafe to approach within contact range of the individual.
> . . .
> A subject fleeing from an officer, by itself, is not justification for the Taser to be deployed and **is prohibited**.

(emphasis in original) (attached hereto as Ex. B).

57.     Defendant Powers has stated regarding the use of force, "[t]he instant compliance is obtained, anything beyond that becomes excessive . . . [but] each time a defense to an arrest is offered, the officer has the ability to exercise whatever the minimum force is in their mind to counter [it]," Segan, Sascha, *What Is Excessive Force?*, ABC News (July 14, 2014), http://abcnews.go.com/US/story?id=96509&page=1 (attached hereto as Ex. J).

58.     In response to a request pursuant to the Virginia Freedom of Information Act, Va. Code § 2.2-3700, *et seq.*, requesting "[t]he [FPD]'s training protocols for the use of a [taser] and all previous versions of those training protocols for the past three (3) years," the FPD produced a PowerPoint entitled "Annual [Conducted Electrical Weapons ("CEW")] User Update" dated April 2013 (the "Training Presentation"), which is attached hereto as Exhibit C. This training presentation states that a requirement of user certification is a "review of this entire presentation including notes." Ex. C at slide 2.

59.     The Training Presentation, in a slide pertaining to the Fourth Amendment, further states that a "CEW in dart mode constitutes an 'intermediate, significant level' of force that must be justified by a strong government interest." Ex. C at slide 6 (citing *Bryan v. MacPherson*, 630 F.3d 805 (9th Cir. 2010)). The Training Presentation, in the same slide, also states that using a

7

"CEW against a non-violent misdemeanant who appears to post no immediate threat and who was given no warning was unconstitutional excessive force." *Id.* (citing *Bryan*, 630 F.3d at 661).

60.     The Training Presentation goes on to quote the Fourth Circuit in another slide about the Fourth Amendment:

> "It is an excessive and unreasonable use of force for a police officer repeatedly to administer electrical shocks with a [CEW] on an individual who no longer is armed, has been brought to the ground, has been restrained physically by several other officers, and no longer is actively resisting arrest."

Ex. C at slide 7 (quoting *Meyers v. Balt. County*, 713 F.3d 723 (4th Cir. 2013) (alteration in original)).

61.     The Training Presentation instructs officers that "[e]very CEW trigger pull or 5 seconds of discharge must be justified under the specific circumstances of the incident." Ex. C at slide 13.

62.     The Training Presentation states officers should "[a]void multiple, repeated, prolonged, extended, or continuous CEW exposures unless necessary to counter reasonably perceived threats and it is justifiable." Ex. C at slide 14.

63.     The Training Presentation, in a slide entitled "Avoid Extended Durations," states that "[s]everal law enforcement groups have set out 15 seconds (multiple applications or continuous) of CEW exposure as a significant safety point[.]" Ex. C at slide 19.

64.     The Training Presentation, in slides entitled "Know Your CEW Trigger Operation Continuous Discharge," states:

- Remember, if you hold the trigger back, the X26 CEW will continue to discharge after 5-second cycle until you release the trigger, as long as the battery charge is sufficient to support discharge; . . . .
- Holding the trigger back may result in continuous, extended, or prolonged CEW discharges and allegations of excessive force or elevated or cumulative subject injury

8

Ex. C at slide 22.

65.     The Training Presentation, in slides entitled "Avoid Extended, Repeated, or

Prolonged [taser] CEW Applications Where Practicable," states:

- Each trigger pull and/or 5-second cycle or discharge must be legally justified
- Avoid extended, repeated, or prolonged CEW applications where practical
- The application of the CEW is a physically stressful event
- Attempt to minimize the physical and psychological stress to the subject
- Only apply the number of 5-second cycles reasonably necessary to capture, control or restrain the subject
  . . .
- If circumstances require extended duration or repeated discharges, the operator should carefully observe the subject and provide breaks in the CEW stimulation when practicable

Ex. C at slide 32-33.

66.     The FPD conducted an investigation into Young's use of force against Mr. Day

on the evening of November 9, 2013.

67.     A video of the incident shot by a bystander was made public shortly after the

November 9, 2013 incident.

68.     According to FPD Public Information Officer Natatia Bledsoe ("Bledsoe") in a

piece posted to Fredericksburg.com and attached hereto as Exhibit D, "[t]his video certainly

appears to capture the events on the night in question." Ex. D.

69.     According to an email from Bledsoe, attached hereto as Exhibit K, once the FPD

became aware of the video, it became part of their internal investigation. E-mail from Natatia

Bledsoe, Fredericksburg Police Dept. Public Information Officer, to Susan Larson,

*Fredericksburg Patch* Editor (Nov. 14, 2013, 14:26 EST) (retrieved as part of FOIA response

from Sergeant Patrick Reed) (attached hereto as Ex. K).

70.     The investigation concluded that Young's "application of the Taser violated the [FPD's] policy on the use of force and was not consistent with the training protocols in place at the [FPD]," as memorialized in an email from Bledsoe and attached hereto as Exhibit E.

71.     Bledsoe went on to say that Young had been disciplined for his use of force against Mr. Day. Ex. E.

72.     Bledsoe stated that all patrol officers had been retrained and recertified in using their tasers. *Id.*

73.     Bledsoe went on to say that

[a]pproximately half of the Tasers used by the department have also been retrofitted with a control device that does not allow a charged activation of the Taser to last longer than five seconds. Those Tasers that cannot be retrofitted due to their model specifications will be replaced by new Tasers that have the timer control already in place.

*Id.*

74.     Pursuant to the operative FPD Directives on November 9, 2013, any time an FPD officer uses force, a use of force report should be generated, signed by that officer's supervisor, and submitted to the office of professional standards for review. *See* Ex. K.

75.     According to Ms. Bledsoe, such a use of force report was generated in response to the November 9, 2013 incident involving Mr. Day. *See* Ex. E.

76.     Following their investigation, the FPD's Office of Professional Standards determined that Young "violated the department's policy on the use of force and was not consistent with the training protocols in place." *Id.*

77.     The FPD disciplined Young. *See id.*

78.     On November 10, 2013, the day following Young's use of force, the City and Powers updated the FPD's policy on use of force regarding five-second taser cycles.

10

79.     This was the only change to the use of force policy.

80.     On information and belief, the City changed FPD directives regarding taser deployment on November 20, 2013 in response to media attention in response to this incident.

81.     Specifically, the new language in FPD Directive 302 as updated, attached herein as Exhibit F, stated:

> [p]ersonnel should use the Taser for one standard cycle (five seconds) and then evaluate the situation to determine if subsequent cycles are necessary. Personnel should consider that exposure to the Taser for longer than 15 seconds (whether due to multiple applications or continuous cycling) may increase the risk of death or serious injury. Any subsequent Taser exposures beyond 15 seconds of multiple applications or continuous cycling should be independently justifiable, and the risks should be weighed against other force options. (Any person exposed to the Taser for longer than 15 seconds **_shall_** be taken to the hospital for a medical evaluation).

Ex. F (emphasis in original).

82.     Mr. Day has suffered and will with reasonable certainty continue to suffer physical and emotional pain arising from this incident.

83.     In the year between November 14, 2012 and November 14, 2013, the FPD engaged in nine use-of-force incidents involving tasers, as memorialized in an email from Bledsoe attached hereto as Exhibit M.

84.     Throughout this period, neither the City nor the FPD took disciplinary action against officers for their involvement in any of the twenty-eight use of force incidents in 2013, despite the fact that there were nine citizen complaints investigated by FPD Professional Standards in 2013. Ex. M.

85.     Throughout this period, the FPD's most common use-of-force measure, even more common than the use of physical force, was tasing. Ex. M.

11

86.     According to a presentation to the City by the FPD attached hereto as Exhibit G, the FPD reported seventeen use of force incidents from May 1, 2013 to December 1, 2013, including seven taser incidents. *See* Ex. G.

87.     On May 1, 2014, the FPD implemented the use of body cameras.

88.     Subsequent to the introduction of body cameras, the number of use-of-force incidents rapidly declined.

89.     From May 1, 2014 to December 1, 2014, the FPD reported only eight use-of-force incidents, a greater than fifty percent reduction, and only five taser incidents. *See* Ex. G.

90.     According to the FPD's 2014 Annual Report, attached hereto as Exhibit H, "the number of sustained complaints and incidents involving use of force dropped substantially in the first eleven months Fredericksburg Police Department Annual Report 2014 since implementation of the body camera system."

91.     The City was furthermore on notice of liability concerns regarding excessive force incidents.

92.     Slides from a presentation for the City Council of Fredericksburg, Virginia on February 24, 2015 prepared by the FPD, attached hereto as Exhibit I, discuss how body cameras can manage liability with reference to excessive force allegations.

93.     A slide titled "Liability" states:

- Liability claims are a major concern of agencies today
- A good quality camera system combined with a well written policy that is properly managed will help in the reduction of liability claims.

Ex. I at slide 24.

94.     A slide titled "Professional Standards" states:

- Cameras aid in the reduction of incidents involving Use of Force.

- Officers and citizens both more likely to act accordingly when they know they are being recorded on video.
- Supervisors can review videos involving Use of Force and respond more appropriately up the chain of command.

Ex. I at slide 19.

95.    The City did not have a body camera system in place when Defendant Young violated Mr. Day's constitutional rights, but the FPD's analysis was correct; the video of Young played a crucial role in accountability.

96.    Until Defendant Young was caught on video tasing Mr. Day and that video made headlines internationally, the FPD did not discipline a single officer for a use of force incident in 2013.

97.    On information and belief, the FPD did not discipline another officer for a use of force incident until the next time the FPD made international headlines on May 4, 2015, when, as described in the FPD news release attached hereto as Exhibit L, Officer Shaun Jurgens used his taser on Fredericksburg resident David Washington after Mr. Washington had suffered a stroke. Ex. L. Officer Jurgens resigned on May 14, 2015. *Id.*


### COUNT I
### Civil Rights Violation of 42 U.S.C. § 1983: 4th Amendment Excessive Force
### *Against All Defendants*

98.    The allegations in the foregoing paragraphs are incorporated as if realleged herein.

99.    At all material times, Defendant Young was acting under color of state or local law.

100.    At all material times, Young had a legal duty to use only the amount and degree of force in the apprehension of unwilling subjects as was reasonable under the circumstances for proper and efficient arrest, supervision, and control of such persons.

101.    By deploying his taser, Young deliberately and intentionally used force against Plaintiff without reasonable basis.

102.    By tasing Mr. Day for forty-two seconds, Young deliberately and intentionally used force against Plaintiff without reasonable basis.

103.    Plaintiff posed no threat to the safety of Young and did not threaten Young in any manner.

104.    Young's use of force was the direct and proximate cause Plaintiff's injuries.

105.    Young's acts constitute excessive force against Plaintiff under these circumstances.

106.    By his actions, Young deprived Plaintiff of the established right to be free from force which was excessive under the circumstances, in violation of Plaintiff's rights under 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the United States Constitution.

107.    Mr. Day was running away from Young when Young tased Mr. Day.

108.    Young recklessly and wantonly fired the high-voltage taser and continuously maintained the electrical current for forty-two seconds.

109.    Young failed to give Mr. Day breaks from being tased.

110.    At no point did Young use breaks at five-second increments to evaluate whether Young had successfully incapacitated Mr. Day, as suggested in the Training Presentation.

111.    Young's use of force caused extreme pain from the use of the taser.

112.    Young's use of force caused injury requiring medical treatment.

113.    Young's use of force entitled Mr. Day to a medical evaluation pursuant to department policy.

114.    Considering all of the circumstances, including City directives and the Fourth Amendment, no reasonable officer would have used a taser on Mr. Day in this situation.

115.    Considering Mr. Day was incapacitated by his fall, no reasonable officer would have maintained the electrical current of the taser for forty-two seconds.

116.    Young used force in a way that no reasonable officer would have.

117.    The use of the taser and the use of the taser for an extended period, described above, were without legal cause and constituted unnecessary and unreasonable excessive force.

118.    As the direct and proximate cause of Young's actions, Plaintiff suffered physical and mental injuries, including pain and suffering.

119.    As a direct and proximate result of Young's actions, Plaintiff has lost money for medical expenses and costs associated with the treatment of his injuries caused by Young and the costs of judicial proceedings associated with this incident.

120.    Young's decision to use the taser was reckless, wanton, retaliatory, and punitive, engendering a claim for punitive damages.


## COUNT II
### Civil Rights Violation of 42 U.S.C. § 1983: Failure to Train and Supervise
### *Against Powers*

121.    The allegations in the foregoing paragraphs are incorporated as if realleged herein.

122.    Defendant Powers, at all relevant times, was Chief of the FPD, with direct oversight responsibility for Defendant Young.

123. Defendant Powers, at all relevant times, was responsible for the training, supervision, and conduct of police officers employed by the Fredericksburg Policy Department.

124. Powers was responsible for providing training regarding the use of force and the proper use of tasers.

125. Powers was responsible, through his duty to supervise, for the violation of Plaintiff's constitutional rights.

126. Powers was aware of the frequency of FPD use of force incidents involving tasers.

127. Powers failed to take steps to reduce those use of force incidents involving tasers.

128. Based upon the Freedom of Information Act ("FOIA") responses described *supra*, the City's policies and trainings contradict one another regarding situations in which taser use is appropriate and proper duration for use of tasers.

129. In the face of such contradictory policies, officers, such as Young, could have been confused regarding the procedures to protect Plaintiff's constitutional rights.

130. In the absence of clear policies, Powers could not supervise officers in such a way that Plaintiff's rights would be protected.

131. For the foregoing reasons, the deliberate indifference and reckless disregard by Powers to the training and supervision of Young with regard to Young's understanding of those laws that protect individuals suspected of crimes led to the violation of Plaintiff's rights.

132. Powers acted under pretense and color of state law.

133. As a direct and proximate cause of said violations by Powers, Plaintiff's constitutional rights were violated and Plaintiff was harmed in violation of the common law of the Commonwealth of Virginia.

134.    As a direct and proximate result of the actions of Powers, Plaintiff has experienced mental and physical anguish and lost money for medical expenses and costs and the costs of judicial proceedings associated with this incident.

135.    These actions by Powers are subject to supervisory liability under 42 U.S.C. § 1983 and punitive damages.

**COUNT III**
***Monell* Claim against the City of Fredericksburg**
**For Unconstitutional Custom, Practices, and Policies**
***Against the City***

136.    The allegations in the foregoing paragraphs are incorporated as if realleged herein.

137.    At all relevant times relating to the conduct complained of herein, the City, through its policymakers, had in force and effect a policy, practice, and custom with respect to the use of tasers that was ineffective and dangerous, including encouraging the use of tasers without properly training, supervising, or disciplining officers who used them.

138.    In the year between November 14, 2012 and November 14, 2013, the FPD engaged in nine use-of-force incidents involving tasers.

139.    Neither the City nor the FPD took disciplinary action against officers for their involvement in any of the twenty-eight use of force incidents in 2013, despite the fact that there were nine citizen complaints investigated by FPD Professional Standards in 2013.

140.    Throughout this period, the FPD's most common use-of-force measure, even more common than the use of physical force, was tasing.

141.    According to a presentation to the City by the FPD, the FPD reported seventeen use of force incidents from May 1, 2013 to December 1, 2013, including seven taser incidents. *See* Ex. G.

142.    On May 1, 2014, the FPD implemented the use of body cameras.

143.    Subsequent to the introduction of body cameras, the number of use-of-force incidents rapidly declined.

144.    From May 1, 2014 to December 1, 2014, the FPD reported only eight use-of-force incidents, a greater than fifty percent reduction, and only five taser incidents. *See* Ex. G.

145.    According to the FPD's 2014 Annual Report, "the number of sustained complaints and incidents involving use of force dropped substantially in the first eleven months Fredericksburg Police Department Annual Report 2014 since implementation of the body camera system." Ex. H at 18-19.

146.    The City was furthermore on notice of liability concerns regarding excessive force incidents.

147.    Slides from a presentation for the City Council of Fredericksburg, Virginia prepared by the FPD, discuss how body cameras can manage liability with reference to excessive force allegations. Ex. I.

148.    A slide titled "Liability" states:

- Liability claims are a major concern of agencies today
- A good quality camera system combined with a well written policy that is properly managed will help in the reduction of liability claims.

Ex. I at slide 24.

149.    A slide titled "Professional Standards" states:

- Cameras aid in the reduction of incidents involving Use of Force.

- Officers and citizens both more likely to act accordingly when they know they are being recorded on video.
- Supervisors can review videos involving Use of Force and respond more appropriately up the chain of command.

Ex. I at slide 19.

150.    The City did not have a body camera system in place when Defendant Young violated Mr. Day's constitutional rights, but the FPD's analysis was correct; the video of Young played a crucial role in accountability.

151.    Until Defendant Young was caught on video tasing Mr. Day and that video made headlines internationally, the FPD did not discipline a single officer for a use of force incident in 2013.

152.    On information and belief, the FPD did not discipline another officer for a use of force incident until the next time the FPD made international headlines in May 4, 2015, when Officer Shaun Jurgens used his taser on Fredericksburg resident David Washington after Mr. Washington had suffered a stroke. Officer Jurgens resigned on May 14, 2015.

153.    These consistent failures in policy, practice, and custom led FPD officers to believe that misconduct would be tolerated and that allegations of abuse would not result in discipline. The pattern made it foreseeable that officers would violate citizens' constitutional rights in precisely the manner that Defendants violated Mr. Day's rights with virtual impunity. The City, through its final policymakers, were deliberately indifferent to this risk.

154.    These consistent failures in policy, practice, and custom allowed for the culture of inadequately trained officers frequently using of tasers such that the use of tasers was the most common type of use of force in 2013 and 2014. This pattern made it foreseeable that officers would violate individual's constitutional rights in precisely the manner Defendants violated Mr. Day's rights. The City, through its final policymakers, were deliberately indifferent to this risk.

19

155.    The City is responsible, through its oversight of policies and procedures regarding

law enforcement, for taser training and supervision, officer misconduct supervision, adequate

internal investigation, and training for the manner in which officers are to use nonlethal force for

the violation of Plaintiff's constitutional rights.

156.    As a direct and proximate result of the actions of City, Plaintiff has experienced

mental and physical anguish and lost money for medical expenses and costs, and the costs of

judicial proceedings associated with this incident.

157.    As a direct and proximate cause of said violations by the City, Defendants

violated Plaintiff's constitutional rights and harmed Plaintiff in violation of the common law of

the Commonwealth of Virginia.

158.    These actions by the City are subject to liability under 42 U.S.C. § 1983.


### COUNT IV
### Common Law Battery
### *Against All Defendants*

159.    The allegations in the foregoing paragraphs are incorporated as if realleged

herein.

160.    Additionally, or in the alternative, in doing the acts alleged above, Defendant

Young acted with the intent to make a contact with Mr. Day's person, or, in the alternative, acted

with the intent to make a harmful, offensive, and/or deleterious contact without adequate or

lawful justification.

161.    Young made a harmful contact with Mr. Day's person.

162.    At no time did Mr. Day consent to any of Young's unlawful or inappropriate acts.


20

163.    Young deployed his taser against Plaintiff without adequate justification and in violation of FPD policy.

164.    Defendants Powers is liable for these violations because of his negligence in hiring or training Defendant Young, as well as their failure to supervise, correct, or prevent the actions of Defendant Young.

165.    Battery is an intentional tort, excluded from the notice requirements of the Virginia Tort Claims Act.

166.    This has caused Plaintiff physical harm, pain, suffering, emotional distress, fear, and humiliation.

167.    Plaintiff is entitled to declaratory and monetary relief, including compensatory damages, punitive damages, attorney's fees, and costs.

## COUNT V
## Common Law Negligence
### *Against All Defendants Except the City*

168.    The allegations in the foregoing paragraphs are incorporated as if realleged herein.

169.    Plaintiff was in obvious and apparent need of medical care even before the arrival of Defendant Young.

170.    Mr. Schmidt stated he expected "[Mr. Day] to be injured" after the crash.

171.    Mr. Day's behavior after the crash was confusing to Mr. Schmidt, including Mr. Day's wandering and his use of profane language followed by a respectful apology.

172.    This behavior "threw" Mr. Schmidt, who indicated Mr. Day was confused and dazed.

21

173.    Subsequent to the trauma of the crash, Mr. Day was subject to forty-two seconds of uninterrupted tasing, during which 50,000 volts of electric current flowed through his body.

174.    Pursuant to the version of FPD Directive 302.00 that was in force at the time of the incident, "[a]ll subjects who have been Tased ***shall*** receive a medical evaluation." (emphasis in original).

175.    At no point did Young offer Mr. Day any medical care.

176.    At no point did Young seek a medical evaluation for Mr. Day.

177.    Young did negligently and without due care fail in his duties to protect Mr. Day by failing to give Mr. Day access to medical care or medical evaluation.

178.    Defendant Young acted in violation of FPD Directive 302.00 by failing to give Mr. Day access to medical care or medical evaluation.

179.    Mr. Day was not competent to decline access to medical care or medical evaluation as he had been in a traumatic car crash.

180.    Mr. Day was not competent to decline access to medical care or medical evaluation as Young tased Mr. Day for forty-two seconds.

181.    Young violated his duty to protect Mr. Day by allowing Mr. Day to deny access to medical care or medical evaluation when Mr. Day was not competent to do so.

182.    Young violated his duty to protect Mr. Day by allowing Mr. Day to decline access to medical care or medical evaluation when FPD Directive 302.00 states that individuals "who have been tased ***shall*** receive a medical evaluation." (emphasis in original).

183.    To the extent that other FPD officers or medical first responders were involved in failing to provide a medical care or evaluation to Plaintiff either on the scene or once Mr. Day was in custody, those individuals have been identified as Defendants John Does 1 through 5.

22

These Defendants have each violated their duty of care to Mr. Day by failing to protect him either by not providing him medical care and evaluation or by allowing Mr. Day to decline access to medical care when FPD Directive 302.00 states that individuals "who have been tased ***shall*** receive a medical evaluation." (emphasis in original).

184.     Mr. Day's injuries, as alleged, either occurred or were exasperated as a result of the absence of due care for his safety and well-being, and constituted an unreasonable failure of duties derived from statute, common law, and FPD policy to protect Mr. Day and not expose him to the severe risk of physical injury and impairment.

185.     The conduct of each John Doe Defendant was reckless, unlawful, and/or negligent. Each John Doe Defendant knew or should have known that of the dangers Mr. Day was exposed to and thereafter failed to act in a reasonable manner.

186.     Defendants owed Mr. Day a duty of reasonable care in the performance of their duties and breached their reasonable duty of care toward Mr. Day by unlawfully and unjustifiably causing, directing and supervising the use of excessive force to fracture Mr. Day's rib and cause multiple contusions to his head and body as alleged, and in mistreating him as alleged.

187.     Defendant Powers is liable under the principles of *respondeat superior* for the aforementioned acts of Young and the John Doe Defendants. Defendant's conduct was a substantial factor in causing Mr. Day to suffer serious physical, psychological, and psychiatric injuries, which have forced him to seek treatment from hospitals, physicians, surgeons, and other medical professionals. The amount of special damages claimed by Mr. Day will be sought according to proof at the time of trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff LANTZ DAY requests that this Court enter judgment in his favor, and against Defendants THE CITY OF FREDERICKSBURG, VIRGINIA; JOSEPH YOUNG; JOHN DOEs 1 through 5; and JAMES POWERS on all Counts and further:

(a) Award damages to Plaintiff Lantz Day in the amount of $5,000,000, or such a greater amount to be determined at trial;

(b) Award compensatory damages to Plaintiff Lantz Day in an amount to be determined at trial;

(a) Award Plaintiff Lantz Day punitive damages as to each of his respective Counts in amounts to be determined at trial;

(b) Award attorney's fees, costs, and expenses incurred by Plaintiff Lantz Day in this action pursuant to statute; and

(c) For any further relief this Court deems just and appropriate under the circumstances.

## JURY DEMAND

### PLAINTIFF LANTZ DAY DEMANDS A TRIAL BY JURY.

Dated:          November 6, 2015                    Respectfully,

Joshua Erlich, VA Bar No. 81298
Benjamin W. Owen, VA Bar No. 86222
Davia Craumer, VA Bar No. 87426
THE ERLICH LAW OFFICE, PLLC
2111 Wilson Blvd., Ste. 700
Arlington, VA  22201
Tel:    (703) 791-9087

Fax:    (703) 722-8114
Email: jerlich@erlichlawoffice.com
        bowen@erlichlawoffice.com
        dcraumer@erlichlawoffice.com