```
        IN THE UNITED STATES DISTRICT COURT FOR THE
                 EASTERN DISTRICT OF VIRGINIA

                      Alexandria Division


LANTZ DAY,                       )
                                 )
    Plaintiff,                   )
                                 )
        v.                       )    1:15cv1477 (JCC/MSN)
                                 )
OFFICER JOSEPH YOUNG,            )
                                 )
    Defendant.                   )
                                 )
```

## M E M O R A N D U M   O P I N I O N

This case arises out of Defendant Officer Joseph Young's use of a Taser in the course of apprehending Plaintiff Lantz Day. It is before the Court now on Defendant's Motion for Summary Judgment [Dkt. 41]. Because there remain unresolved material issues of fact, Defendant's Motion will be granted in part and denied in part.

### I. Background

The facts upon which the Court relies are taken primarily from Defendant's Listed Statement of Undisputed Material Facts. *See* Mem. in Supp. of Mot. for Summ. J. [Dkt. 42] at 2-9 ("SOF"). They are undisputed unless otherwise noted. As the Court has already catalogued the circumstances of this case in a prior Order [Dkt. 25], it repeats here only the facts germane to its ruling on Defendant's Motion.

On November 9, 2013, Plaintiff was involved in a car accident with several other vehicles. SOF ¶¶ 3, 7-8. Defendant was the first police officer to respond, and was the only officer present throughout the events giving rise to this suit. *See id.* ¶ 19.

En route, the police dispatch center relayed to Defendant that an individual involved in the accident had fled the scene. *Id.* ¶ 5. It further reported that the man in question was acting "combative" towards those who attempted to prevent his flight, and had threatened to kill anyone who called the police. *Id.*

Upon arriving, Defendant found the road blocked by damaged vehicles and was forced to disembark his police cruiser. *Id.* ¶ 6. Multiple bystanders then directed Defendant to a nearby intersection, where others pointed Plaintiff out as the man who had fled the scene of the accident. *Id.* ¶¶ 7, 15. Defendant observed Plaintiff "moving aggressively toward bystanders." *Id.* ¶ 15.

Defendant approached Plaintiff and ordered him to lie down with his hands out to his sides. *Id.* ¶ 16. Defendant advised Plaintiff that he was not under arrest, only being detained. *See* Opp. [Dkt. 44] at 1-2; Young Tr. 66-67. Plaintiff refused to comply. SOF ¶ 16. Defendant then drew his

Taser and threatened to use it if Plaintiff did not do as he asked. *Id*.

Plaintiff lied down with his hands beneath his torso. *Id*. ¶¶ 16-17. Defendant again threatened to use his Taser if Plaintiff did not bring his hands out to his sides, then began to radio for backup. *Id*. ¶ 17. At that point, Plaintiff pushed himself up and began to flee. *Id*.

Defendant immediately "deployed his Taser toward [Plaintiff]'s rear torso." *Id*. ¶ 18. The probes struck Plaintiff and he fell. *See id*. ¶¶ 18-20. One of the probes, however, did not properly attach, becoming lodged in Plaintiff's clothing. *Id*. ¶ 20.

The parties dispute what followed. Defendant claims that Plaintiff remained "able to move and speak" because the probe failed to attach, *id*. ¶ 21, and "actively resist[ed] arrest while being handcuffed." *Id*. ¶ 19. Plaintiff, on the other hand, contends that the Taser — while not entirely effective — still delivered enough of an electrical shock to subdue him. *See* Opp. [Dkt. 44] at 2-3. According to Plaintiff, his movements once struck by Defendant's Taser were involuntary, and he did not actively resist arrest. *See id*.

The parties agree, however, that Defendant maintained the Taser's electrical current for 42 seconds during the incident. *See* Mot. to Dismiss Exh. 60. Defendant continued to

3

depress the trigger of the Taser until a bystander, Robert Schmidt, took handcuffs from Defendant and placed them on Plaintiff's wrists. *Id*. ¶¶ 20-21.

Defendant took Plaintiff into custody without further incident. *See id.* ¶¶ 23-24. Plaintiff was later sentenced to prison for a term of six and one half years in connection with the accident. *See id.* ¶ 26.

On November 6, 2015, Plaintiff filed suit against the City of Fredericksburg, five John Doe defendants, former Fredericksburg Police Chief James Powers, and Defendant Officer Joseph Young. Plaintiff alleged a variety of claims, all of which were either voluntarily dismissed or dismissed by the Court, *see* Order [Dkt. 25], but for Plaintiff's claims against Defendant for excessive use of force under the Fourth Amendment and battery under Virginia law.

Defendant now moves for summary judgment, contending that he is entitled to qualified immunity with respect to the claims that remain.[1]

---

[1] Defendant separately argues that he is entitled to qualified immunity and that his actions did not violate the Fourth Amendment. But the former argument necessarily encompasses the latter, as whether Defendant is entitled to qualified immunity rests in part upon whether he violated Plaintiff's constitutional rights. *See Raub v. Campbell*, 785 F.3d 876, 881 (4th Cir.), *cert. denied*, 136 S. Ct. 503 (2015). The Court therefore addresses these arguments together.

4

## II. Legal Standard

"Summary judgment is appropriate only if taking the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party, 'no material facts are disputed and the moving party is entitled to judgment as a matter of law.'" *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (quoting *Ausherman v. Bank of Am. Corp.*, 352 F.3d 896, 899 (4th Cir. 2003)). An unresolved issue of fact precludes summary judgment only if it is both "genuine" and "material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party" on that issue. *Id*. at 248. It is material if it "might affect the outcome of the suit under the governing law." *Id*. "In the end, the question posed by a summary judgment motion is whether the evidence 'is so one-sided that one party must prevail as a matter of law.'" *Lee v. Bevington*, 647 F. App'x 275, 277 (4th Cir. 2016) (quoting *Anderson*, 477 U.S. at 252).

## III. Analysis

In evaluating whether Defendant is entitled to qualified immunity, the Court must determine "(1) whether the plaintiff has established the violation of a constitutional right, and (2) whether that right was clearly established at the time of the alleged violation." *Raub v. Campbell*, 785 F.3d 876,

5

881 (4th Cir. 2015), *cert. denied*, 136 S. Ct. 503 (2015). The order in which to decide these issues is left to the Court's discretion. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

### A. Defendant's Initial Decision to Deploy His Taser

Plaintiff contends that Defendant is not entitled to qualified immunity with respect to his initial decision to deploy his Taser because Defendant could not have reasonably believed Plaintiff to be a threat warranting the use of such force. *See* Opp. [Dkt. 44] at 6-10. Plaintiff does not dispute, however, that he was fleeing, and thus resisting a lawful seizure, when Defendant deployed his Taser. Defendant is therefore entitled to qualified immunity with respect to his initial deployment of his Taser pursuant to *Estate of Armstrong ex rel. Armstrong v. Village of Pinehurst*, 810 F.3d 892, 907 (4th Cir. 2016), *cert. denied*, __ S. Ct. __, 2016 WL 2839881 (U.S. Oct. 3, 2016).

In *Armstrong*, police officers were called to involuntarily commit a mentally ill man. *See id.* at 896. When the officers approached, the man wrapped his arms and legs around the base of a stop sign and refused to let go. *Id.* at 896-97. One of the officers then used a Taser to shock the man five times in an effort to dislodge him. *Id.* at 897. The man died shortly thereafter. *Id.* at 898.

In a lawsuit brought by the man's estate, the Fourth Circuit held that the police officer's actions constituted excessive use of force under the Fourth Amendment. *See id*. at 899. The Court nonetheless concluded that the officer was entitled to qualified immunity because the "right not to be subjected to tasing while offering stationary and non-violent resistance to a lawful seizure" was not then clearly established. *Id*. at 907. Earlier cases had held that police officers may not use a Taser on an individual not actively resisting arrest, but the law was "not so settled . . . that 'every reasonable official would have understood'" what was constitutionally required when an individual offered nonviolent resistance. *Id*. at 908 (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)).

The Court extrapolates from this that any right not to be tased while offering *mobile*, as opposed to stationary, non-violent resistance to a lawful seizure was not clearly established at the time of the events giving rise to this suit. As in *Armstrong*, Defendant deployed his Taser while Plaintiff was actively resisting detention and after issuing several verbal warnings. *See id*. These are precisely the characteristics of the situation in *Armstrong* that left the applicable law "not . . . settled." *Id*.

7

While viewing the facts in the light most favorable to Plaintiff, Defendant may have been "treading close to the constitutional line," *id.*, the Court must conclude that the line was not clearly drawn before *Armstrong*. Accordingly, the Court finds that Defendant is entitled to qualified immunity with respect to his decision to deploy his Taser to prevent Plaintiff from fleeing after repeated warnings.

### B. Defendant's Continuous Use of the Taser for 42 Seconds

That Defendant is entitled to qualified immunity with respect to his initial decision to deploy his Taser does not resolve Defendant's Motion. "[F]orce justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated." *Waterman v. Batton*, 393 F.3d 471, 481 (4th Cir. 2005). The Court must therefore determine whether Defendant's use of his Taser remained justified throughout the 42 seconds he maintained the Taser's electrical current.

The Court finds that genuine issues of material fact preclude summary judgment on this issue. Specifically, the record fails to conclusively establish what effect the Taser had on Plaintiff and whether, when, and to what extent Plaintiff resisted detention during the 42 seconds Defendant maintained the Taser's electrical current. Moreover, these disputed issues

8

of fact bear heavily on Defendant's entitlement to qualified immunity. Accordingly, Defendant's Motion must be denied with respect to his continuous use of a Taser on Plaintiff for 42 seconds. *See Anderson*, 477 U.S. at 248.

### 1. Whether the Factual Dispute is Genuine

Defendant claims that, because one of the Taser's probes failed to properly attach, the Taser caused Plaintiff merely "a tingling sensation," Rep. [Dkt. 45] at 4, and Plaintiff "actively resist[ed] arrest while being handcuffed." SOF ¶ 19. Plaintiff, on the other hand, claims that the Taser subdued him almost immediately, and that his movements after the Taser's probes struck were an involuntary response to the electrical current. *See* Opp. [Dkt. 44] at 2-3, 10.

In view of the record, the Court has little difficulty concluding that this dispute presents a triable issue of fact. Of particular importance to the Court's holding is a video of the incident shot by a bystander and admitted into evidence. *See* Mot. to Dismiss Exh. 60. In it, Plaintiff collapses as soon as he is struck by the Taser's probes. He proceeds to cry out, and at one point pleads with Defendant to stop. Given this evidence, Defendant's claim that the Taser caused Plaintiff no more than "a tingling sensation" strains credulity. The video is sufficient that "a reasonable jury" viewing it could find that the Taser subdued Plaintiff almost immediately. *Anderson*,

9

477 U.S. at 248; *see also Scott v. Harris*, 550 U.S. 372, 381 (2007) (noting the high probative value of video in evaluating a disputed incident on a motion for summary judgment).

Moreover, much of the evidence upon which Defendant relies is at best ambiguous as to whether Plaintiff continued to resist detention after Defendant deployed his Taser. For example, in one passage from Defendant's deposition testimony cited in his statement of facts, Defendant testified that when he depressed the Taser's trigger

> [Plaintiff] went down, was kind of still like moving around, is best I can describe it. Moving around. He yelled something.

Young Tr. [Dkt. 42-45] at 72.

This testimony is, on its face, more consistent with Plaintiff's account of events than Defendant's. Defendant suggests that the Taser caused Plaintiff to collapse, indicating that it was at least partially effective in subduing Plaintiff. Moreover, Defendant states that Plaintiff simply "mov[ed] around" after being struck by the Taser, finding no better way to describe Plaintiff's actions. That Plaintiff's movements did not appear directed toward any identifiable purpose bolsters Plaintiff's claim that they were involuntary.

Similarly, Defendant's Motion cites heavily to a portion of Defendant's deposition testimony in which he claims Plaintiff failed to comply with instructions after being struck

10

by the Taser.  Young Tr. [Dkt. 42-45] at 100.  But Defendant continued to depress his Taser's trigger while issuing those instructions.  Plaintiff contends that he was incapable of voluntary movement while Defendant maintained the Taser's electrical current.  *See* Opp. [Dkt. 44] at 2-3.  Plaintiff's failure to follow Defendant's instructions could have resulted from incapacity as easily as from conscious refusal.

The testimony of Robert Schmidt, upon which Defendant also relies, is likewise ambiguous as to Plaintiff's resistance after being struck by the Taser.  Mr. Schmidt testified that Defendant encountered difficulty handcuffing Plaintiff after deploying his Taser "either due to [Defendant] was getting tangled in the [T]aser wires . . . [or] due to [Plaintiff]'s movements."  R. Schmidt Tr. [Dkt. 42-43] at 36.  This does not indicate that Plaintiff intentionally thwarted Defendant's efforts to restrain him.  Indeed, it is unclear from Mr. Schmidt's testimony that Plaintiff's movements — as opposed to the Taser's wires — presented any impediment at all.

Moreover, Defendant appears to concede that the Taser had at least *some* incapacitating effect on Plaintiff.  In attempting to justify the 42-second length of the Taser discharge, Defendant argues that Plaintiff might have "continued in his attempt to flee, or even become more aggressive and potentially harm [Defendant] and nearby bystanders if

11

[Defendant] had released the trigger mechanism of the Taser." Mem. in Supp. of Mot. for Summ. J. [Dkt. 42] at 15. If, as Defendant claims, the Taser caused Plaintiff no more than a "a tingling sensation," Rep. [Dkt. 45] at 4, it is not clear how continuously depressing the Taser's trigger prevented Defendant from fleeing or harming bystanders.

In light of the above, a reasonable jury could find that the Taser was largely effective, and that Defendant maintained its electrical current long after Plaintiff ceased resisting.

### 2. Whether the Disputed Facts are Material

Having established that the factual dispute is genuine, the Court now turns to whether it is material. In light of the Fourth Circuit's opinion in *Meyers v. Baltimore Cty., Md.*, 713 F.3d 723 (4th Cir. 2013), the Court easily concludes that it is.

In *Meyers*, police responded to a report of a violent altercation and found the suspect wielding a baseball bat. *See id.* at 727-28. When the suspect refused to drop the bat, one of the officers deployed his Taser in probe mode.[2] *See id.* at 728.

---

[2]    A Taser may function in either "probe" mode, in which two probes are fired at a distance and the target, if struck, suffers paralysis, or in "stun" mode, in which the Taser's electrodes are applied directly and "'the [t]aser does not cause muscular disruption or incapacitation, but rather functions only as a 'pain compliance' tool.'" *Meyers*, 713 F.3d at 735 n.3

12

The officer administered three shocks before the suspect stopped advancing and fell to the ground. *Id.* After discharging his Taser once more in probe mode, the officer switched to stun mode and shocked the suspect several additional times. *Id.* The man died shortly thereafter. *Id.* at 729.

In a lawsuit brought by the man's family, the Fourth Circuit held that the officer was entitled to qualified immunity with respect to his initial use of the Taser to subdue the suspect, but not as to his continued use of the Taser after the suspect had fallen to the ground. *Id.* at 735. Once that happened, the suspect "did not pose a threat to the officers' safety and was not actively resisting arrest." *Id.* The continued use of a Taser beyond that point violated the man's clearly established Fourth Amendment rights. *See id.*

Viewing the disputed issues of fact in the light most favorable to the nonmoving party, Plaintiff likewise "did not pose a threat to [Defendant's] safety and was not actively resisting arrest," *id.* at 735, during the great majority of the 42 seconds that Defendant maintained his Taser's electrical current. Rather, Plaintiff was lying prone, convulsing, and no longer making any effort to flee. In light of *Meyers*, should a jury accept Plaintiff's account of events, Defendant could

---

(quoting *Meyers v. Baltimore Cty., Md.*, 814 F. Supp. 2d 552, 555 n.3 (D. Md. 2011)).

easily be found to have violated Plaintiff's clearly established Fourth Amendment rights. Accordingly, the disputed factual issue is material, as it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.[3]

Defendant argues that *Meyers* is distinguishable because Plaintiff was not fully "incapacitated" or "subdued." *See* Rep. [Dkt. 45] at 9. But as discussed above, whether and to what extent Plaintiff was "incapacitated" or "subdued" is, based upon this record, a question for the jury. Moreover, whether Plaintiff was fully "incapacitated" or "subdued" is relevant to, but not dispositive of, the ultimate issue of whether Plaintiff "pose[d] a threat to [Defendant's] safety" or "was . . . actively resisting arrest" during the 42 seconds Defendant maintained his Taser's electrical current. *Meyers*, 713 F.3d at 735.

A closer examination of the specific circumstances of this case confirms that the disputed facts are material. When evaluating an excessive force claim, Courts engage in "'a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the

---

[3] The Court notes that in *Meyers*, one of the Taser discharges was only partially effective. *See* 713 F.3d at 728 n.4. The Fourth Circuit did not differentiate between the effective Taser discharges and the "bad tase" in holding that the use of a Taser violated the subject's Fourth Amendment rights.

14

countervailing governmental interests at stake.'" *Smith v. Ray*, 781 F.3d 95, 101 (4th Cir. 2015) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (U.S. 1989)). In conducting this analysis, three considerations are particularly salient: the severity of the crime allegedly committed, the threat posed to the officer and others, and any resistance offered. *Armstrong*, 810 F.3d at 899.

As to the first consideration, Defendant was unsure whether Plaintiff had committed *any* crime at the time of the incident. Defendant "ma[de] it clear" that Plaintiff was not under arrest at the outset because Defendant "d[idn't] know what [he] [had] at that point." Young Tr. [Dkt. 42-45] at 67. Rather, Defendant detained Plaintiff based primarily on his aggressive demeanor, and "[d]idn't [then] know" the extent of Plaintiff's involvement in the nearby accident. *Id*. While Defendant argues that Plaintiff was later convicted of serious crimes, the Fourth Amendment concerns itself with "the perspective of a reasonable officer on the scene, including what the officer knew *at the time*, not with the 20/20 vision of hindsight." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015) (emphasis added).

As to the threat Plaintiff posed to Defendant and others, Defendant observed Plaintiff acting erratically and aggressively. *See* Young Tr. [Dkt. 42-45] at 65-67. But Plaintiff is not alleged to have acted violently, either before

15

or after Defendant arrived at the scene. Moreover, viewing the disputed facts in the light most favorable to the nonmoving party, Plaintiff posed no threat during the great majority of the 42 seconds Defendant maintained his Taser's current.

Finally, again viewing the disputed facts in the light most favorable to Plaintiff, Plaintiff's resistance was limited to initial disobedience and a brief attempt at flight. These efforts ended when Plaintiff was brought to the ground by Defendant's Taser. Plaintiff offered no further resistance during the 42 seconds that Defendant maintained his Taser's electrical current. Rather, he simply convulsed involuntarily.

Turning to "'the proportionality of the force in light of'" the above, *Smith v. Ray*, 781 F.3d 95, 101 (4th Cir. 2015) (quoting *Waterman*, 393 F.3d at 481), the Court notes that a Taser is a "weapon . . . designed to 'caus[e] . . . excruciating pain,' and application can burn a subject's flesh." *Armstrong*, 810 F.3d at 902 (citations omitted). Deploying a Taser at all constitutes a "serious use of force." *Id*. To use a Taser on an individual continuously for 42 seconds, assuming the Taser to be at least partially effective, is a use of force that may fairly be characterized as extreme. *See, e.g.*, *Meyers*, 713 F.3d at 728 n.5, 734 (holding that the use of a Taser for 35 seconds, leading to the subject's death, constituted excessive force); *Orem v. Rephann*, 523 F.3d 442, 447–48 (4th Cir. 2008) (rejecting

the argument that applying a Taser for 1.5 seconds results in only *de minimis* injury); *cf. Fontenot v. Taser Int'l, Inc.*, 736 F.3d 318, 323 (4th Cir. 2013) (attributing an individual's death to improper application of a Taser for 42 seconds); *Bachtel v. TASER Int'l, Inc.*, 747 F.3d 965, 967 (8th Cir. 2014) (attributing an individual's death to improper application of a Taser for 31 seconds).

The City of Fredericksburg Police Department — Defendant's employer — recognizes as much. It has adopted a policy limiting the use of a Taser on a given subject to 15 seconds:

> ***Do not have more than three uses of the Taser against a person during a single event. (If this occurs the subject shall be taken to the hospital for a medical evaluation.)***

Opp. Exh. 9 [Dkt. 44-4] at 7 (bold, italics, and underline in original).[4] The Court notes that Defendant's testimony indicates he did not intend to discharge his Taser for more than 15 seconds, but simply lost track of time. *See* Young Tr. [Dkt. 42-45] at 73 ("I know – after seeing the video once, when they showed it to me, I know it's 42 seconds. At the time, for whatever reason, in my mind I thought it was ten to 15 seconds."). It is not clear that, had

---

[4] At the hearing held on this matter, Plaintiff's counsel explained — and Defendant's counsel did not contest — that the Taser "uses" referenced in the policy are five-second discharges.

Defendant known how long he was depressing his Taser's trigger, he would have continued to do so for 42 seconds. *See* Opp. Exh. 6 [Dkt. 44-3] ("So I'm thinkin' [sic] at that point, ten to 15 seconds, in my mind — I don't know what was goin' [sic] through his mind — um, that what — that's how I proceeded. Then I find out that it's 42 seconds, um, you know, which I — I don't — I don't, like, I mean . . ."). One might infer from this that Defendant likewise understood the use of a Taser for 42 seconds to constitute an unusually high degree of force.

\* \* \*

In light of the above, Defendant is likely not entitled to qualified immunity should a jury accept Plaintiff's account of events. Conversely, if a jury were to accept Defendant's version of the facts, Defendant is likely entitled to qualified immunity for the reasons discussed above in Section III(A). The Court is unable rule on the issue until these ambiguities are resolved.

Defendant's Motion for Summary Judgment must therefore be denied as to his continuous use of a Taser on Plaintiff for 42 seconds. The Court will "submit [the] factual questions to the jury and reserve for itself the legal question of whether . . . [D]efendant is entitled to qualified immunity on the facts found by the jury." *Yates*

18

*v. Terry*, 817 F.3d 877, 882 n.2 (4th Cir. 2016) (quoting *Willingham v. Crooke*, 412 F.3d 553, 560 (4th Cir. 2005)). The Court notes that the denial of qualified immunity on this basis is not immediately appealable, *see id.* at 882, and so the parties should prepare for trial.

### C. Plaintiff's State Law Claims

Turning to Defendant's argument regarding Plaintiff's claim of battery under Virginia law, the Court notes that it is relegated to two sentences at the end of Defendant's brief.

Defendant contends first that he is entitled to "sovereign immunity" as to Plaintiff's battery claim "because he acted in good faith and with reasonable belief in the validity of his actions." Mem. in Supp. of Mot. for Summ. J. [Dkt. 42] at 19. In support of this proposition, Defendant cites two cases decided by the Virginia Supreme Court that make no mention of immunity at all. Rather, both hold simply that a police officer is not liable for the tort of false imprisonment when an arrest results from a reasonable mistake of law or fact. *See Yeatts v. Minton*, 211 Va. 402 (1970); *DeChene v. Smallwood*, 226 Va. 475, 480 (1984). Defendant points to no such mistake in this instance or what conduct that mistake would excuse.

Defendant next argues that the "use of reasonable force during the course of a lawful arrest by a police officer does not constitute the crime of battery under Virginia law."

19

Mem. in Supp. of Mot. for Summ. J. [Dkt. 42] at 19. Defendant supports this with a citation to a case holding that "[a] touching" that is "justified or excused . . . is not unlawful and therefore not a battery" under Virginia law. *Gnadt v. Commonwealth of Virginia*, 27 Va. App. 148, 151 (1998). Given the issues discussed above, whether the "touching" in this instance was "justified or excused" will turn on facts to be determined by a jury. Accordingly, the Court will deny Defendant's Motion as to Plaintiff's common law battery claim.

### IV. Conclusion

For the foregoing reasons, Defendant's Motion will be granted in part and denied in part. Defendant's Motion will be granted as to Plaintiff's Fourth Amendment claim insofar as it relates to Defendant's initial decision to deploy his Taser. Defendant's Motion will be denied in all other respects, and the parties will be required to confer with the Court as to a trial date. An appropriate order will issue.

|  |  |
|---|---|
| October 6, 2016 | /s/ |
| Alexandria, Virginia | James C. Cacheris |
|  | UNITED STATES DISTRICT COURT JUDGE |